# IN THE SUPREME COURT OF TEXAS

═══════════
No. 12-0102
═══════════

TEXAS COAST UTILITIES COALITION, PETITIONER,

v.

RAILROAD COMMISSION OF TEXAS AND CENTERPOINT ENERGY
RESOURCES CORP. D/B/A CENTERPOINT ENERGY ENTEX AND
CENTERPOINT ENERGY TEXAS GAS, RESPONDENTS

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued September 10, 2013**

JUSTICE BOYD delivered the opinion of the Court.

The sole issue in this appeal is whether the Railroad Commission of Texas had authority to adopt a gas utility rate schedule that provided for automatic annual adjustments based on increases or decreases in the utility's cost of service. We agree with the court of appeals that the Commission acted within its authority, and affirm.

## I.
## Background

CenterPoint Energy Resources Corporation is a gas utility[1] that distributes natural gas to customers located within the Texas Coast Division.[2] In 2008, CenterPoint filed a "statement of

---

[1] Generally, a "gas utility" is an individual or entity that transmits or distributes natural gas for compensation within the state. *See* TEX. UTIL. CODE § 101.003(7).

[2] The Texas Coast Division is a service region that includes parts of Waller, Austin, Fort Bend, Wharton, Matagorda, Brazoria, Galveston, Harris, and Chambers counties.

intent" to raise its rates with each of the Division's forty-seven municipalities, which have original jurisdiction to set rates within their respective boundaries, and with the Commission, which has original jurisdiction to set rates in the Division's areas that are not within any municipal boundaries.[3] Thirty-eight of the municipalities approved the proposed rate schedule, but the remaining nine cities[4] denied it. CenterPoint appealed the denials to the Commission, which consolidated the appeals with its own related case covering the areas outside of municipal boundaries. The nine cities formed the Texas Coast Utilities Coalition, through which they jointly appeared in the consolidated rate case. A group of state agencies that are CenterPoint customers also intervened, joining the Coalition's opposition to the proposed rate increase. After a three-day contested case hearing, the Commission rejected some aspects of the proposed rate schedule and accepted others, ultimately approving a rate increase to allow CenterPoint to generate $1.2 million in additional annual revenue, but not the $2.9 million that CenterPoint had proposed.

CenterPoint's proposed rate schedule included a "cost of service adjustment" (COSA) clause, which permitted the rate to increase or decrease annually without the necessity of an additional full rate case. The Commission concluded that CenterPoint's original proposed COSA clause was "not reasonable," but accepted a revised COSA clause as part of the final rate schedule. Under the revised COSA clause, the amount of the annual adjustment is calculated by adding the amounts of

_____

[3] *See* TEX. UTIL. CODE § 104.102 (requiring utility to file a statement of intent with each affected regulatory authority). CenterPoint also published a notice of intent to increase its rates in various newspapers distributed within the Texas Coast Division.

[4] The nine cities are Angleton, Baytown, Clute, Freeport, League City, Pearland, Shoreacres, West Columbia, and Wharton. Generally, the term "municipality" includes towns and villages as well as cities. See *Edinburg Hosp. Auth. v. Treviño*, 991 S.W.2d 76, 84 (Tex. 1997) (citing TEX. LOCAL GOV'T CODE § 1.005(3) and TEX. GOV'T CODE 29.001). Although not every "municipality" is a "city," the distinction is not material in this case, and we will use the terms interchangeably.

CenterPoint's operating expenses, return on investment, and Texas franchise tax liability from the preceding calendar year, subtracting the amount of CenterPoint's non-gas and other revenues, and then dividing the result by the Texas franchise tax statutory rate.[5] The quotient is then converted to a per-customer adjustment by dividing it by the average number of customers in each customer class (residential customers, general service-small volume customers, and general service-large volume customers). CenterPoint then divides the amount of the per-customer adjustment by twelve and either adds the result to or subtracts it from each customer's monthly gas bill. Any resulting increase or decrease, however, is capped at 5% of the customer charge that was in effect at the end of the preceding calendar year.

To effectuate the annual adjustment, the COSA clause requires CenterPoint to file with the Commission and each affected municipality, by May 1 of each year, sworn statements and schedules containing the information necessary to calculate the adjustments to be applied to customer bills on or after August 1 of that year. The Commission and municipalities would thus have at least ninety days to review and object to the schedules and proposed adjustments, and CenterPoint must reimburse "their reasonable expenses for such review in an aggregate amount not to exceed $100,000." Meanwhile, within forty-five days after filing the schedules, CenterPoint is required to publish a notice of the proposed adjustments in the Houston Chronicle describing the proposed rate revision, the effect that the revision is expected to have on each customer class and on average

_____

[5] The "return on investment" component of this calculation is a fixed amount that the Commission set through the rate case proceeding to ensure that CenterPoint receives a return that is reasonable but not greater than reasonable. Here, the Commission set the amount based on an 11.8% return. The Coalition and state agencies do not contest the reasonableness of this figure. The Texas franchise tax rate is set by the State.

3

customer bills within that class, the service areas where the adjustments will apply, and the means by which customers can obtain additional information.

The COSA clause includes several provisions intended to ensure that the Commission and municipalities retain the ability to review and object to the automatic adjustments. First, the clause provides that the Commission and any municipality that objects to the adjustment by the end of the ninety-day review period can "take action to deny such adjustment, and [CenterPoint] shall have the right to appeal" the denial. Second, the clause provided that the COSA is effective only for an initial implementation period of three years, after which CenterPoint, the Commission, or an affected municipality can object to its renewal.[6] Third, the clause provides that it "does not limit the legal rights and duties" of the Commission or any municipality, and "[n]othing herein shall abrogate the jurisdiction of [the Commission or a municipality] to initiate a proceeding at any time to review whether rates charged are just and reasonable." Finally, the clause provides that its provisions "are to be implemented in harmony with the Gas Utility Regulatory Act."

In its final order approving the new rate schedule, the Commission expressly found that "it is reasonable to allow CenterPoint to implement the revised cost of service adjustment clause." In support of this finding, the Commission found that, under the COSA clause, the Commission and municipalities can "examine the prudence of additions made to rate base as part of the annual COSA filing," will "ultimately determine[] the reasonableness and necessity of expenses to be recovered in the COSA," are permitted to "conduct a hearing on the COSA filing," and can "grant in part and deny in part the utility's request to implement a COSA adjustment." In its conclusions of law, the

---

[6] Due to the Coalition cities' objections, the COSA clause was effective only for the first three years (2008–2011) and was not renewed.

Commission determined that approval of a COSA tariff "lies within the Commission's jurisdiction, . . . does not conflict with the rate-setting provisions of [the Gas Utility Regulatory Act], . . . [and] does not prevent a utility or a regulatory authority from exercising the statutory right to initiate a rate case."

The Coalition and the state agencies that had intervened filed this action for judicial review of the Commission's order, challenging the Commission's authority to adopt the COSA clause as part of CenterPoint's rate schedule.[7] The district court held that the Commission "did not have statutory authority" to adopt the COSA clause and remanded the matter to the Commission. The Commission and CenterPoint appealed, and the Austin Court of Appeals reversed, concluding that the Commission did not exceed its statutory authority. *See R.R. Comm'n of Tex. v. Tex. Coast Utils. Coal.*, 357 S.W.3d 731 (Tex. App.—Austin 2011, pet. granted). The Coalition and the state agencies petitioned this Court for review, which we granted.

## II.
## Statutory and Regulatory Framework

The Coalition and state agencies raise both procedural and jurisdictional challenges to the Commission's authority to adopt the COSA clause. Before addressing their specific arguments, we will provide context to the issues by briefly addressing the source of the Commission's authority, the purpose of the Gas Utility Regulatory Act, the jurisdiction that Act grants to the Commission and to municipalities, the procedures that they must follow when approving rates, the substantive requirements that those rates must meet, and the Commission's historical practices and rules relating to COSA clauses.

---

[7] Other issues raised in the trial court are not at issue here.

5

## A. The Source of Commission Authority

Although the Texas Constitution specifically mentions the Railroad Commission, *see* TEX. CONST. art. XVI sec. 30(b), it does not create the agency but instead merely authorizes the Legislature to do so. *City of Denison v. Mun. Gas Co.*, 3 S.W.2d 794, 798 (Tex. 1928). Based on this constitutional authority, the Legislature has established the Commission through chapter 81 of the Natural Resources Code. TEX. NAT. RES. CODE §§ 81.001–.156. As a statutorily created body, the Commission has no inherent authority, and instead has only the authority that the Legislature confers upon it. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001). Its authority includes the powers that a statute expressly grants (express authority) and also the powers "reasonably necessary to carry out the express responsibilities given to it by the Legislature" (implied authority). *Id.* But "reasonably necessary" does not mean merely "expedient." The Commission "may not . . . exercise what is effectively a new power, or a power contradictory to the statute," even if it "is expedient for administrative purposes." *Id.* at 316; *see also Pub. Util. Comm'n of Tex. v. GTE-SW., Inc.*, 901 S.W.2d 401, 407 (Tex. 1995).

## B. The Express Purpose of GURA

One statute through which the Legislature has granted authority to the Commission is the Gas Utility Regulation Act (GURA). TEX. UTIL. CODE §§ 101.001–105.051. Through GURA, Texas "to date has continued to impose a comprehensive regime of traditional rate regulation on gas utilities." *CenterPoint Energy Entex v. R.R. Comm'n of Tex.*, 208 S.W.3d 608, 616 (Tex. App.—Austin 2006, pet. dism'd). As a result, gas utilities in Texas "are by definition monopolies in the areas they serve" and are thus immune from "the normal forces of competition that regulate

6

prices" in the open market. TEX. UTIL. CODE § 101.002(b). To protect the public from harms often associated with monopolies, the Legislature enacted GURA to authorize governmental entities to act "as a substitute for competition." *Id.* The express purpose of GURA is to "establish a comprehensive and adequate regulatory system for gas utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities." *Id*. § 101.002(a). The Legislature has instructed courts to construe GURA "liberally to promote the effectiveness and efficiency of regulation of gas utilities," except to the extent a liberal construction would render the statute invalid. *Id*. § 101.007.

## C.     Regulatory Jurisdiction Under GURA

In GURA, the Legislature broadly granted the Commission "all the authority and power of this state to ensure compliance with the obligations of gas utilities in this subtitle." *Id.* § 104.001(a). Regarding the utilities' "rates and services," however, GURA grants authority to municipalities as well as to the Commission. Specifically, municipalities have exclusive original jurisdiction over the rates and services of gas utilities that distribute gas within their municipal boundaries, *id.* § 103.001, while the Commission has exclusive original jurisdiction over rates and services in areas that are near municipalities but outside of municipal boundaries, commonly referred to as the "environs." *Id.* § 102.001(a)(1).[8] GURA expressly authorizes municipalities and the Commission (which it refers to collectively as "regulatory authorities," *see id.* § 101.003(13)) to "establish and regulate" rates within their respective jurisdictions. *Id.* § 104.001(b). The municipalities' original jurisdiction, however, is subject to the Commission's jurisdiction over appeals from the

_____

[8] By Commission rule, "environs" are "unincorporated areas adjacent to or near incorporated cities and towns." 16 TEX. ADMIN. CODE § 7.115(14).

7

municipalities' rate orders. *Id.* § 102.001(b). When a party appeals a municipality's order to the Commission, the Commission reviews the decision de novo and must enter a final order establishing the rates the municipality should have set. *Id.* § 103.055(a), (c).

**D.     Rate Case Proceedings Under GURA**

GURA sets forth specific procedures that a gas utility must follow before it can increase its rate. The utility must first file a statement of intent to increase its rate with each regulatory authority that has original jurisdiction over the rate at issue, and must publish notice to its customers of the proposed increase. *Id.* §§ 104.102, 104.103. The regulatory authority may hold a hearing to assess the propriety of the proposed increase, and must do so if an affected person complains or if the new rate would increase the utility's revenues by the greater of $100,000 or 2-1/2 percent (which GURA calls a "major change"). *Id.* §§ 104.101, 104.105. At the hearing, the utility has the burden of proving that its proposed new rate meets GURA's substantive requirements. *Id.* § 104.008(1).[9]

Generally, a municipality may postpone the effective date of the proposed new rate until it completes the hearing and renders its decision, but only for ninety days from the utility's proposed effective date. *Id.* § 104.107(a)(1). Similarly, the Commission may postpone the effective date for a period of 150 days. *Id.* § 104.107(a)(2). If the regulatory authority fails to render a final decision by the postponed effective date, it is considered to have approved the proposed new rate. *Id.* § 104.107(c). If the regulatory authority rejects the utility's proposed rate, it must enter an order establishing the rate the utility must charge. *Id.* § 104.110(a)(1). Any party to the proceeding may

---

[9] If a party initiates the proceeding with a proposal to reduce the existing rate, the utility has the burden to prove that the existing rate is just and reasonable and should not be reduced. TEX. UTIL. CODE § 104.008(2).

8

seek judicial review of the Commission's final order, and the courts will review the order under the substantial evidence rule. *Id.* § 105.001.[10]

### E.    Computation of Rates Under GURA

GURA sets forth detailed substantive requirements that a gas utility's rates must meet. Ultimately, the regulatory authority must "ensure" that the rate "is just and reasonable." *Id*. § 104.003(a). More specifically, the rate must be calculated to "establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." *Id.* § 104.051. Rates must "not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer." *Id*. § 104.003(a).

A rate calculation begins with the utility's "rate base," which essentially reflects the amount of the utility's investment in its gas distribution system. *See id.* § 104.053.[11] The rate base is then adjusted for the cost of capital (i.e., the cost of borrowing money or selling equity) and the utility's operating costs, to determine the rate needed to produce a "fair return" on the utility's investment. *See id.* §§ 104.052, 104.055(a); *see also id.* §§ 104.051–.059. The final rate schedule may consist of several components. The schedule approved here, for example, sets CenterPoint's rate as the sum of three figures: (1) a base rate (not to be confused with the "rate base"), which is a specified amount per customer plus a volumetric charge that varies from month to month based on the customer's

---

[10] Because the issue in the case is whether the statute authorizes the Commission's decision, not whether the evidence supports it, the substantial evidence rule is not implicated.

[11] The "adjusted value of invested capital used and useful to the utility in providing service" is "computed on the basis of a reasonable balance between . . . (1) original cost, less depreciation" and "(2) current cost, less depreciation." *Id.* § 105.053(a)(1), (2).

9

usage; (2) a "tax adjustment" tariff, which passes through to customers the cost of CenterPoint's municipal franchise tax liabilities;[12] and (3) a "purchased gas adjustment" (PGA) tariff, which passes through to customers fluctuations in CenterPoint's cost to purchase the gas it distributes to customers.[13] The COSA clause that the Coalition and state agencies challenge in this case affects the base rate component, by increasing or decreasing the specified amount billed per customer.

## F. The Commission and COSA Clauses

The inclusion of a COSA clause in a gas utility rate schedule is not uncommon in Texas. The Commission appears to have first approved such a clause in 1978, more than thirty-five years ago. *See* Railroad Commission Order, Docket Nos. 1144, 1145 (April 3, 1978). Like the COSA clause at issue in this case, the 1978 COSA clause provided for automatic annual adjustments based on increases or decreases in the utility's costs during the previous calendar year,[14] required the utility to provide advance notice of the amount of the proposed adjustments, and preserved the Commission's "right to accept, reject or suspend" the proposed adjustments. For at least the past twenty years, hundreds of municipalities have also approved rate schedules that include COSA

---

[12] Under Rate Schedule No. FFA-1, applicable to CenterPoint under the Commission's order, CenterPoint is to "adjust Customer's bill each month in an amount equal to the municipal franchise fee payable for the Gas Service provided to Customer by [CenterPoint]." For a discussion of franchise taxes imposed on gas utilities and passed on to customers, see *S. Union Co. v. Cty. of Edinburg*, 129 S.W.3d 74 (Tex. 2003).

[13] Under Rate Schedule No. PGA-7, applicable to CenterPoint under the Commission's order, the "Monthly Rate contained in [CenterPoint's] total billing to residential and general service customers shall include the cost of natural gas purchased for resale hereunder," which is calculated for each rate period as: (CenterPoint's best estimate of the cost of natural gas to be purchased for resale) x (the percentage of the amount of gas purchased for resale that was actually sold to customers) ± (any surcharge or surcredit for previous over- or under-recovery of gas purchase costs), rounded to the nearest $0.0001. CenterPoint may propose a new PGA factor in a PGA filing, without filing a notice of intent to increase rates, and the proposed PGA rate will become effective the next month unless the regulatory authority takes action to oppose it.

[14] The 1978 COSA clause was not as detailed as the COSA clause at issue here, but similarly adjusted rates based on fluctuations in the utility's "costs of providing gas service (including depreciation but excluding cost of gas, gross receipts taxes, income taxes and return)."

10

clauses, just as the thirty-eight cities that approved CenterPoint's original proposed rate did in this case.

Consistent with and indicative of the common usage of COSA clauses in Texas, the Commission has adopted rules addressing such provisions. In one rule, the Commission has defined a COSA clause as "any rate provision other than a purchased gas adjustment clause provided for in § 7.5519 of this title (relating to Gas Cost Recovery), which operates to increase or decrease rates without prior consent or authority of the appropriate regulatory authority." 16 TEX. ADMIN. CODE § 7.115(10). In a separate rule, the Commission has required utilities that propose a rate change in the environs based on a COSA clause effective in an adjacent municipality to submit with their proposal a copy of the COSA clause, "all calculations used to derive the cost of service adjustment," and information describing "the effect of the proposed rates on each affected customer class." *Id*. § 7.210(b)(1), (2). And in yet another rule, the Commission has provided that a COSA clause effective in an adjacent municipality "shall not be applicable or put into effect for the affected environs area, although the utility may request the same rates that are in effect in the adjacent municipality for the affected environs area." *Id.* § 7.220(c). In spite of these rules and the longstanding common usage of COSA clauses,[15] the Coalition and state agencies contend that the Legislature has not granted the Commission authority to include COSA clauses in Texas gas utility rate schedules. We now address their arguments in support of this contention.

**III.**

---

[15] Although we need not rely on the doctrine of legislative acceptance in this case, we note that during these thirty-five years the Legislature has not amended GURA or taken other action to prohibit the Commission or municipalities from including COSA clauses in utilities' rate schedules. *Cf. Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004) (discussing the doctrine of legislative acceptance).

11

**Discussion**

As mentioned, the rate schedule the Commission approved for CenterPoint includes three main components—a base rate, a tax adjustment, and a PGA tariff—and the COSA clause is included as part of the base rate. The Coalition and state agencies do not challenge the tax adjustment or the PGA tariff. They also do not contend that CenterPoint failed to provide a timely statement of intent or otherwise failed to comply with GURA's procedural requirements in the rate case that resulted in the Commission's final order. Instead, they contend that (1) GURA does not expressly or impliedly authorize the Commission to include the COSA clause as a component of CenterPoint's base rate, and (2) the COSA clause violates GURA by allowing Centerpoint to avoid GURA's procedural requirements for future rate increases and by depriving municipalities of their original jurisdiction over those proceedings. Based on the language of GURA,[16] we disagree with both arguments.

**A.      GURA Expressly Authorizes the Commission to Establish "Rates," Including COSA Clauses.**

---

[16] Because the Legislature determines and declares the Commission's authority, we resolve this case by construing and applying Texas statutes to determine whether the Legislature intended to give the Commission authority to adopt a COSA clause. The construction of a statute is a question of law that we review de novo. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). "Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006).

"We have long held that an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *Tex. Citizens*, 336 S.W.3d at 624. Relying on these holdings, the court of appeals in this case decided to "defer" to the Commission's construction that GURA authorizes the inclusion of COSA clauses. *Tex. Coast Util. Coal.*, 357 S.W.3d at 745. The parties and certain amici disagree whether such deference was appropriate in this case, and some urge that we use this case as an opportunity to add clarity to the so-called agency deference doctrine. Because we independently conclude that GURA grants the Commission authority to adopt the COSA clause, we need not "defer to" the Commission's construction or give it "serious consideration," and we do not agree that this is an appropriate case to provide any clarity that may be needed.

12

GURA expressly grants the Commission the authority to "establish and regulate rates of a gas utility," TEX. UTIL. CODE § 104.001(a); to "determine the propriety of [an] increase [in rates]," *id.* § 104.105(a); to "enter an order establishing the rates [a utility] shall charge or apply for [its services]" in areas outside of municipal boundaries, *id.* § 104.110(a)(1); and on appeal from a municipality's rate order, to "enter a final order establishing the rates [the Commission] determines the municipality should have set," *id.* § 103.055(b). The Legislature has thus expressly granted the Commission authority to establish gas utility rates. The question, then, is whether the COSA clause constitutes a "rate."

GURA defines a "rate" as:

(A)     any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a gas utility for a service, product, or commodity described in the definition of gas utility in this section; and

(B)     a rule, regulation, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification.

*Id.* § 101.003(12). Considering both subsections of this definition, and reading them in conjunction with the express authority to "establish rates," we conclude that GURA expressly authorizes the Commission to establish both that which a utility "demand[s], observe[s], charge[s], or collect[s]" for distributing gas and that which "affect[s]" that which the utility "demand[s], observe[s], charge[s], or collect[s]."

The Austin Court of Appeals has concluded that, through subsection (B) of this definition, the Legislature "has recognized that a rate may consist not merely of a fixed dollar amount but may instead be a rule 'affecting' the charge, a term contemplating the use of variables." *CenterPoint*

13

*Energy Entex v. R.R. Comm'n of Tex.*, 208 S.W.3d 608, 618 (Tex. App.—Austin 2006, pet. dism'd). We generally agree. The rate schedule establishes Centerpoint's "charges" and "compensation," and the COSA clause provides that the charges and compensation will adjust annually to account for differences between CenterPoint's estimated and recorded expenses. By including the COSA clause in the rate schedule, the Commission has "established" a "practice"[17] that "affects" CenterPoint's charges and compensation. We thus conclude that the COSA clause constitutes a "rate" under subsection (B),[18] and GURA expressly authorizes the Commission to establish it.

The Coalition and state agencies raise a number of arguments against this construction of the statute. For the reasons explained below, we do not find them convincing.

### 1.    The Role of a Definition

Citing to our decision in *State v. Public Utilities Commission*, 344 S.W.3d 349 (Tex. 2011), the state agencies argue that a statutory definition cannot serve as a source or basis of agency authority. In that case, the court of appeals had concluded that the Texas Public Utility Commission (PUC) did not exceed its authority when it relied on the Utility Code's definition of "market value" as an alternative basis for determining the market value of stranded costs. *See CenterPoint Energy Houston Elec., LLC. v. Gulf Coast Coal. of Cities*, 252 S.W.3d 1, 27 (Tex. App.—Austin 2008), *rev'd in part and aff'd in part sub nom, State v. Pub. Util. Comm'n*, 344 S.W.3d 349, 356 (Tex.

---

[17] Because we conclude that the COSA clause is a "practice," we need not decide whether it is a "rule" or "regulation."

[18] We also note, without deciding, that the COSA clause could also constitute a "rate" under subsection (A). *See* TEX. UTIL. CODE § 101.003(12)(A). No one disputes that the COSA is a "tariff." The clause expressly identifies itself as such, and the Commission refers to it as a "tariff" throughout its order. And at least when the adjustment is positive—i.e., when it increases the amount customers must pay—it results in a "charge" to CenterPoint's customers and "compensation" to CenterPoint for a "service, product, or commodity." The language of subsection (A) does not limit that prong of the definition to fixed amounts. *See id.*

14

2011). We disagreed and held that the PUC could not rely on the statutory definition as an alternative basis when the Utility Code's substantive provision expressly "specifies the permitted methods for determining market value." 344 S.W.3d at 360. The state agencies contend that, like the PUC in that case, the Commission in this case cannot "derive authority from a statutory definition in abrogation of the substantive law." But the Commission does not contend, and we do not hold, that the statutory definition of "rate" grants authority to the Commission; rather, the Commission contends, and we hold, that GURA's substantive provisions grant the Commission the power to "establish rates." The definition of "rates" gives meaning to this substantive grant of authority.

### 2. The GRIP Statute

The Coalition and state agencies also argue that our construction ignores other provisions of GURA and thus ignores the context of the provisions that grant authority to establish rates and that define the term "rate." *See, e.g.*, *Zanchi v. Lane*, 408 S.W.3d 373, 376 (Tex. 2013) ("A word's meaning cannot be determined in isolation, but must be drawn from the context in which it is used."). Specifically, they point to section 104.301 of GURA, commonly known as the "GRIP" (Gas Reliability Infrastructure Program) statute, which the Legislature enacted in 2003. TEX. UTIL. CODE § 104.301. The GRIP statute authorizes a gas utility that has filed a rate case within the preceding two years to "file with the regulatory authority a tariff or rate schedule that provides for an interim adjustment in the utility's monthly customer charge or initial block rate to recover the cost of changes in the investment in service for gas utility service," without initiating a rate case. *Id.* § 104.301(a). The legislative purpose behind the GRIP statute was to provide utilities with a

15

five-year window in which to increase their rates to account for new capital investments in infrastructure without having to file a rate case, thus encouraging utilities to invest in Texas's gas pipeline infrastructure in the face of "continuing growth in the state" and a desire to "enhance safety by replacing aging facilities." *Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 157–58 (Tex. 2011).

The Coalition argues that the GRIP statute demonstrates that the Legislature "knows perfectly well how to adopt provisions that streamline the ratemaking process," and would have adopted a similar provision for COSA clauses if it intended to authorize the Commission to use such clauses. They also argue that there would have been no need for the GRIP statute if the Commission's authority to "establish rates" already included the authority to adopt variable, formulaic rates. But these arguments incorrectly assume that the GRIP statute provides the same kind of authority as the provisions that authorize the Commission to "establish rates." To the contrary, the GRIP statute does not authorize *the Commission* (or a municipality) to approve and include an adjustment mechanism in a rate schedule. Rather, it authorizes *the gas utility* to file a tariff adjusting its own rates without obtaining the regulatory authority's approval, including any approval in the utility's original rate schedule. *Atmos Energy*, 353 S.W.3d at 157 (explaining that the GRIP statute "permits a gas utility to file a new tariff adjusting its base rates to recover the costs of new capital investment made in the preceding calendar year, without the necessity of filing a rate case"). Thus, unlike COSA clause adjustments, the GRIP statute permits adjustments that the Commission has not approved through a full rate case. *See id.* at 158 (recognizing that the GRIP statute allows a utility to "begin recovering the costs of new investment *not already covered by a*

16

*final rate*" (emphasis added)). The GRIP statute thus authorizes adjustments that are outside of, and materially different from, the Commission's general authority to "establish rates." The Legislature's decision to enact the GRIP statute thus does not contradict its prior grant of authority to the Commission to establish practices like COSA clauses.

### 3.    PGA Tariffs

The Coalition and state agencies also contend that our construction of the Commission's statutory authorization to "establish rates" ignores our prior constructions of GURA, and that of Texas courts of appeals, particularly those concerning PGA tariffs. A PGA tariff is a common component of a rate schedule that provides for automatic adjustments in customer charges based on fluctuations in a utility's cost to purchase the gas it distributes. *See CenterPoint Energy Entex v. R.R. Comm'n of Tex.*, 208 S.W.3d 608, 612 (Tex. App.—Austin 2006, pet. dism'd) (describing PGA tariffs as "an automatic escalator mechanism devised by utility regulators to deal with rapid fluctuations in the cost of natural gas[, which] operates to increase or decrease the revenue of the gas company by exactly the amount of its increased or decreased costs of gas charged the gas company by its suppliers"). As we have noted, the CenterPoint rate schedule at issue here includes a PGA tariff, and the Coalition and state agencies do not contest this aspect of the Commission's order.[19] Instead, they contend that Texas courts have authorized PGA tariffs only "as a matter of

---

[19] Although they do not challenge the use of the PGA, the Coalition does point out that GURA does not specifically reference the use of fuel cost adjustments, whereas the Public Utility Regulatory Act (PURA) does. *See* TEX. UTIL. CODE §§ 36.201, 36.203 (providing for "the timely adjustment of a utility's fuel factors, with or without a hearing"). The Austin Court of Appeals has addressed this point:

> [T]he legislature enacted the provision granting the [PUC] authority to review and reconcile the prudence of fuel costs at a time when it had prohibited the PUC from allowing electric utilities to use automatic fuel cost adjustment clauses like PGAs. By contrast, Texas courts by that time had approved the use of PGA clauses by gas utilities. Against this legal backdrop, the legislature understandably

17

agency policy and common law," not based on the language of the statute. From that contention, they reason that judicial approval of PGA tariffs on policy and common law grounds would have been unnecessary if, as we hold today, the statutory authority to "establish rates" already includes the authority to approve clauses that provide for automatic adjustments based on cost fluctuations.

We disagree with this argument because we disagree with its foundational contention that courts have approved PGA tariffs based only on policy reasons and not on the language of the statute. To the contrary, when this Court addressed PGA tariffs nearly forty years ago, we characterized the tariff as "a charge" and as "a component of the rate" that the statute authorized. *San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 266 (Tex. 1976). Quoting from an earlier Attorney General opinion, we described a PGA tariff as "a lawful exercise of the municipality's rate regulation power" to "establish[] a rate schedule." *Id.* at 266–67 (quoting Attorney General Op. H-741 (Nov. 20, 1975)). A few years later, we recognized that PGA tariffs are justified based on the statute's "mandate[] that the Commission structure a system that will permit the utility to recover all of its operating expenses." *R.R. Comm'n of Tex. v. High Plains Natural Gas Co.*, 628 S.W.2d 753, 753 (Tex. 1981). More recently, and similar to the construction we adopt today, the Austin Court of Appeals held that a PGA tariff included as part of the base rate in a rate schedule constitutes a "'rule' [that] fits squarely within [subsection B of] the statutory definition of 'rate,'" and thus the "gas rate consists of its entire rate schedule, which may result in

---

provided a method for timely review and adjustment of an electric utility's fuel costs as an alternative for fuel factor adjustment clauses while including no such provision regarding gas utilities.

*CenterPoint Energy Entex,* 208 S.W.3d at 620 (citations omitted).

18

differing customer charges month-to-month." *CenterPoint Energy Entex*, 208 S.W.3d at 619.[20]  As

we read these cases, Texas courts have long held that the statutory language authorizes the inclusion

of PGA tariffs in rate schedules.

It is true, as the Coalition and state agencies point out, that the courts have explained and

discussed the policy reasons that justify PGA tariffs.  This Court has noted, for example, that PGA

tariffs were first "enacted at a time of rapid and enormous increases in the cost of fuel," *San Antonio*

*Indep. Sch. Dist.*, 550 S.W.2d at 266, and the Austin court has noted that "fuel costs are particularly

subject to dramatic and unforeseeable changes" and "constitute such a large proportion of a utility's

total costs that any substantial regulatory lag in approving rate increases to reflect fuel cost increases

can cause the rapid financial ruin of an otherwise healthy utility."  *CenterPoint Energy Entex*, 208

S.W.3d at 617.  But the courts have not cited—indeed, they could not cite—these policy concerns

as justification for a judicial grant of authority to an executive branch agency.  As we have

explained, statutorily created agencies like the Commission have only the authority that the

Legislature confers upon them by statute.  *Pub. Util. Comm'n of Tex.*, 53 S.W.3d at 315.  It is thus

irrelevant to our analysis whether the same policy concerns that justify a PGA tariff also justify

COSA clauses.  Even if, as the Coalition and state agencies contend, they do not, our task is simply

---

[20] The Austin court concluded that a PGA tariff included within a rate schedule constitutes a "rule" under subsection B of the statutory definition of rate.  *CenterPoint Energy Entex*, 208 S.W.3d at 619.  We have concluded that the COSA clause constitutes a "practice" under subsection (B), and have thus declined to determine whether it is also a "rule" or "regulation."  *See supra* note 17.  Also, as the Coalition and state agencies point out, the Austin court stated that "Texas has never expressly addressed the use of PGA clauses in a statute."  *CenterPoint Energy Entex*, 208 S.W.3d at 613.  We agree that the statute does not "expressly" address PGA clauses, but that is different than holding that the statute does not "expressly" authorize the Commission to adopt such clauses by authorizing it to regulate and establish rules and practices that affect compensation and charges.  By concluding that the inclusion of a PGA tariff in a rate schedule "fits squarely within" the statute's definition of a rate, the Austin court found that such clauses are authorized by statute, and not merely by common law based on judicial policy choices.  *See id.*

19

to determine whether the statute authorizes the Commission to include such clauses in a gas utility's rate schedule.[21]   Our conclusion that it does is not inconsistent with our state courts' prior discussions of PGA tariffs.

### 4.    Commission Rules

Finally, the Coalition and state agencies argue that the Commission's own rules conflict with our construction of GURA.  Specifically, as we have noted, the Commission has adopted three rules regarding COSA clauses: one defining a COSA clause, one requiring additional filings when a utility proposes a rate change in the environs based on a COSA clause effective in an adjacent municipality, and a third providing that a COSA clause effective in an adjacent municipality "shall not be applicable or put into effect for the affected environs area, although the utility may request the same rates that are in effect in the adjacent municipality for the affected environs area." 16 TEX. ADMIN. CODE §§ 7.115(10), 7.210(b), 7.220(c).  The Coalition contends that the third rule, 7.220(c), prohibits the use of a municipality-approved COSA clause in adjacent environs, and instead "requires the Commission to review increases in base rates for customers in the environs using the traditional cost of service basis."

Disagreeing with the Coalition's construction of rule 7.220(c), the court of appeals held that, "rather than prohibiting the use of cost-of-service adjustment clauses for environs rates, this section simply provides that such clauses are subject to review by the Railroad Commission and will not be

---

[21] *See, e.g.*, *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629 (Tex. 2013) ("[W]e read unambiguous statutes as they are written, not as they make the most policy sense.  If a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results."); *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 139 (Tex. 2013) ("In Texas, however, the Legislature must make this policy determination. Our role in statutory construction is merely to give effect to the Legislature's intent by examining the plain meaning of the statute." (citations omitted)).

automatically applicable as adjacent municipality rates." *Tex. Coast Util. Coal.*, 357 S.W.3d at 746 (emphasis in original). We agree. Although, as the Coalition notes, the terms "shall not" are typically prohibitive, we cannot read the terms in such a manner within the context of this rule. The rule first provides that when a utility proposes an increase in an environs rate pursuant to a COSA clause in effect in an adjacent municipality, the Commission "shall review" that increase "on a cost of service basis." 16 TEX. ADMIN. CODE § 7.220(c). It then provides that the COSA "in effect in the adjacent municipality shall not be applicable or put into effect for the affected environs area, although the utility may request the same rates that are in effect in the adjacent municipality for the environs area." We read the rule to mean that the municipality-approved COSA clause will not be automatically effective in the environs but will be subject to the Commission's own independent review to ensure that the cost of service justifies the clause. The rule expressly provides that the utility "may request the same rates that are in effect in the adjacent municipality," and those rates would include any COSA clause. We agree with the Commission and the Austin court that this rule does not prohibit the Commission from adopting a COSA clause as part of the rate applicable to the environs, but instead ensures that such a clause will be permitted only after the Commission has determined that including it in the rate is appropriate.

We thus reject the Coalition's and state agencies' arguments that our construction of GURA finds a grant of authority in a statutory definition or is inconsistent with the GRIP statute, prior court holdings regarding PGA tariffs, or the Commission's rule 7.220(c). We conclude that, by granting the Commission the authority to establish "rates," and defining "rates" to include "practices" that

21

affect a utility's compensation and charges, GURA expressly grants the Commission authority to include a COSA clause in a gas utility's rate schedule.

**B.      The COSA Complies with GURA's Mandates**.

Although GURA expressly authorizes the Commission to establish practices that, like a COSA, affect a utility's compensation and charges, both the Commission and the COSA must still comply with all of GURA's procedural, substantive, and jurisdictional mandates. *See, e.g.*, *Pub. Util. Comm'n of Tex.*, 53 S.W.3d at 323 (holding that PUC had authority to establish rates for investor-owned utilities' use of each other's transmission facilities, but the "access fee" portion of rate was inconsistent with Public Utility Regulatory Act and therefore exceeded the PUC's statutory authority); *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685, 688 (Tex. 1992) (observing that Commission must exercise its authority "consistent with the laws of this state" and "consistent with its statutory authority"). Thus, in addition to granting authority to the Commission, GURA also limits the exercise of that authority to practices and rates that satisfy GURA's requirements. The Commission may not, for example, establish a practice that does not ensure that the rate is "just and reasonable," *see* TEX. UTIL. CODE § 104.003(a), or that is not calculated to "establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses," *id.* § 104.051.

The Coalition and state agencies argue that the CenterPoint COSA clause violates the purpose and provisions of GURA in two ways. First, they contend that the COSA clause allows CenterPoint to change its rates without complying with GURA's notice and hearing procedures. *See*

22

*id.* §§ 104.101–.112.  Second, they contend that the COSA clause usurps the municipalities' exclusive original jurisdiction over CenterPoint's rates within municipal borders. *See id.* § 103.001. We disagree with both contentions.[22]

### 1. Rate Changes Must Be Approved, But They Need Only Be Approved Once.

Under GURA, a utility that wishes to increase its rate must timely file a statement of intent, and the regulatory authority or any affected person may initiate a full rate case by contesting the proposed increase. *See id.* §§ 104.102(a), 104.105.  The Coalition and state agencies contend that the COSA clause allows CenterPoint to increase its rate without complying with these procedures. Noting that GURA's definition of "rate" includes both (A) "any compensation [or] charge" that the utility demands, charges, or collects, and (B) a practice that affects the compensation or charge*, see id.* § 101.003(12), the Coalition and state agencies contend that *both* the charge *and* the practice are a "rate," and thus GURA requires that the utility comply with the procedural requirements before it can increase *either.*[23]  "Thus," the Coalition argues, "to increase a 'charge' the utility must abide by the same criteria that apply to increasing a 'rate.'"

Generally, we agree with the Coalition that a "charge" is a "rate"—the statute expressly says so—and when a utility wishes to change its rate (whether the rate is a "charge" or a "practice" or some other term that falls within the statutory definition of a "rate") the utility must comply with

---

[22] No party contends that the COSA clause constitutes an improper delegation of the Commission's authority to CenterPoint. *Cf. Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 653–54 (Tex. 2004) (considering whether Texas Worker's Compensation Commission's dispute and audit rules constituted improper delegation of its authority to private entities); *San Antonio Ind. Sch. Dist.*, 550 S.W.2d at 266–67 (rejecting contention that fuel adjustment charge constituted an improper delegation of ratemaking power to city).

[23] The Coalition argues: "In other words, in the court [of appeal]'s view, it is possible to have a 'rate' that allows for increases in the amount of money the utility collects through 'charges,' but which does not constitute an increase in a 'rate.' This result does not withstand scrutiny."

23

the statutory notice and rate case procedures. But we disagree with the Coalition's conclusion. Once a rate is approved pursuant to a proper rate proceeding, it need not be re-approved each time it is applied. This is true whether the "rate" approved by the Commission is a fixed dollar amount (like a flat, per-customer fee) or a formula with fixed inputs (like a charge calculated by multiplying a fixed dollar amount by a customer's units of usage) or a formula with variable inputs (like a COSA or a PGA or pass-through tax tariffs). The total amount of money billed to a utility's customers and collected by the utility changes on a month-to-month basis because even if all other factors were constant, customer usage generally varies from month to month. So we disagree with the Coalition to the extent it construes the terms "compensation" and "charge" (as used in subsection (A) of the definition of "rate") to mean the amount that a customer is required to pay (that is, the amount the customer is billed) in any given month. Gas bills routinely change from month to month based on the amount of gas the customer uses, because the "charge" is typically a specified amount per hundred cubic feet that the customer uses. The "compensation" and "charge," in other words, are not the amount a customer must pay each month, but the basis by which that amount is determined.

More importantly, although we agree that the COSA clause may change the basis by which the amount of a customer's bill is determined (i.e., it may change the "charge,"), and that change may result in an increase in the amount of the customer's bill, we do not agree that the change results in an increase in the "rate." The Commission's rate-making authority includes the authority to establish "practice[s]" that "affect[]" the basis by which the amount of a customer's bill is determined, and it is not possible for such a practice to "affect" the basis without changing it in some way. Application of a "practice" that "affect[s]" a "charge" necessarily changes the charge in some

24

manner; if every application of a previously approved "practice" required new rate case proceedings, approval of the practice itself would be meaningless. The inclusion of subsection (B) in the definition of "rate" would be meaningless if the effect of subsection (A) were to require notice and a rate case to validate each application of the rule or practice that "affects" the basis by which the amount of a customer's bill is determined. We cannot construe GURA in a manner that renders subsection (B) superfluous. *See Atmos Energy*, 353 S.W.3d at 162 ("We presume that every word of a statute has been included or excluded for a reason.").

The Coalition and state agencies, however, contend that our construction renders subsection (A) superfluous. We disagree. As we read the statute, a rule or practice that affects a charge is simply a part (generally, a formulaic part, rather than a fixed or volumetric part) of the basis by which the amount of a customer's bill is determined. If the rate schedule does not include a COSA clause or other such rule or practice that affects the charge, the fixed or volumetric basis by which the amount of the bill is determined is still the "rate," because it is the "compensation" or "charge" under subsection (A). But when the Commission adopts a rule or practice that "affects" the compensation or charge, it has established not two rates (each of which must be approved through separate rate proceedings), but one. Both the charge and the practice are part of the one "rate," and together they establish the basis by which the amount of the customer's bill is to be determined. CenterPoint and the Commission complied with GURA's procedural requirements in connection with the rate case that resulted in the order establishing CenterPoint's rate, which includes the COSA clause. By definition, the COSA clause "affects" the compensation and charges that CenterPoint

25

can demand, charge, and collect, and GURA does not require a new rate case each time it does so.

### 2. Municipal Jurisdiction

Finally, the Coalition argues that the COSA clause violates GURA by usurping municipalities' exclusive original jurisdiction to establish rates within their borders. GURA expressly "does not authorize the railroad commission to . . . affect the jurisdiction, power, or duty of a municipality" that has not ceded its original jurisdiction to the Commission, except as otherwise provided in GURA. *See id.* § 102.002(2). The Coalition contends that the COSA clause affects the municipalities' exclusive original jurisdiction by allowing CenterPoint's compensation and charges to change without allowing the municipalities to review the change as GURA provides.

For example, the Coalition complains that the COSA clause alters GURA's requirements regarding which test year serves as the basis of the rate calculations. "Ratemaking begins with an historic test year," from which data regarding the utility's expenses and revenues is gathered and then "adjusted to more accurately reflect costs [that] will be incurred in the future." *Pub. Util. Comm'n v. GTE-Southwest*, 901 S.W.2d 401, 411 (Tex. 1995). GURA defines a test year as "the most recent 12 months [prior to the rate case proceeding] . . . for which operating data for a gas utility are available." TEX. UTIL. CODE § 101.003(16). An appeal from a municipality's rate order is "based on the test year presented to the municipality adjusted for known changes and conditions that are measurable with reasonable accuracy." *Id.* § 103.055(a). Thus, under GURA, the utility's rate is typically based on costs incurred during the year prior to the rate case. By contrast, under the COSA clause, CenterPoint's rate could be adjusted each year, based on the preceding calendar

26

year's cost data. By adjusting the rate based on more recent cost data, the COSA clause may reduce "regulatory lag,"[24] *see Tex. Coast Util. Coal.*, 357 S.W.3d at 738 (discussing the COSA clause's effect of allowing CenterPoint's rates "to 'self-correct' without the cost and regulatory lag of a conventional rate case"), and allow the utility's actual revenues to more closely match the rate of return that the Commission set at the ratemaking hearing. But, as the Coalition points out, by incorporating data regarding costs incurred in successive years, the COSA clause permits adjustments based on data that has not been subjected to the municipality's review through a full rate case. The Coalition argues that this prohibits municipalities from fulfilling their statutory duty as regulators under GURA, and "could easily lead to a rate design that is no longer fair and equitable to all customer classes."

Similarly, the Coalition complains that the COSA clause (1) requires a municipality to conduct its review of proposed adjustments contemporaneously with, instead of prior to, the Commission's review; (2) deprives the municipality of its statutory right to postpone the effective

---

[24] This Court has previously recognized the Commission's discretion in dealing with "regulatory lag" when acting within the authority the Legislature has delegated to it. *See R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex. 1983). In *Lone Star Gas*, the Commission entered an order setting new rates and making them effective from a date approximately one year before the order was entered. *Id.* at 423. Lone Star sought judicial review, asking the courts to require an even earlier effective date. *See id.* Reversing the court of appeals' judgment, which "created a judicial requirement that agencies make orders effective within sixty days of [the] hearing," we stated that, "[a]lthough we believe that agencies should conduct their business in a prompt manner, any mandatory requirement should come from the legislature." *Id.* at 424. We held that utilities did not have an absolute right to be compensated for losses due to regulatory lag, and that "[a]ny change in protection for the utility against undue regulatory lag should come from the legislature." *Id.* at 427. Relying on this holding, the Coalition contends that the Commission lacks authority to adopt a COSA because the Legislature has not specifically authorized COSAs as a means of addressing regulatory lag. We have noted that some degree of regulatory lag is "inherent in the process," *see Lone Star Gas*, 656 S.W.2d at 425, and we agree with the Coalition that regulatory lag is a risk generally born by utility investors. But our holding in *Lone Star Gas* rejected judicial interference with the Commission's discretion over its rate-setting responsibilities, so long as the Commission exercises its discretion within the bounds of its statutory authority. *See id.* As we have already held that GURA expressly authorizes the Commission to include COSA clauses in rate schedules, *Lone Star Gas* provides no basis to reject that authority simply because the clauses may reduce regulatory lag.

date of a new rate for up to ninety days to complete the hearing and render its decision;[25] (3) deprives the municipality of its right under GURA to stay the effect of the new rate pending an appeal;[26] and (4) arbitrarily caps the amount of recoverable review expenses at $100,000 for all regulatory authorities that the adjustment affects.[27] Although we have briefly noted responses to some of the Coalition's complaints, the conclusive response to all of these complaints is that the COSA clause need not provide for a full GURA rate case prior to an annual adjustment in CenterPoint's rate because the COSA clause and the adjustment are the product of a full rate case,

---

[25] *See* TEX. UTIL. CODE § 104.107(a)(1).

[26] In a rate case, a utility seeking to increase its rates may put the proposed rate into effect "by filing a bond with the regulatory authority if the regulatory authority fails to make a final determination within 90 days from the date the proposed increase would otherwise be effective." *See* TEX. UTIL. CODE § 104.109(a). PURA has a similar provision authorizing electric utilities to "bond-in" proposed rates: section 36.110. *See id.* § 36.110. The Coalition relies on *Ark. La. Gas Co. v. R.R. Comm'n of Tex.*, 586 S.W.2d 643, 644 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.), in which the Austin Court of Appeals addressed a predecessor of section 36.110, Tex. Rev. Civ. Stat. art. 1446c, § 43(e). The court construed section 43(e) to authorize utilities to "bond-in" their proposed rate if the municipality with original jurisdiction failed to issue an order on their proposed rate increase within ninety days but did not authorize utilities to "bond-in" their proposed rate during the time period after the municipality issued an order, while the order was pending on appeal before the Public Utility Commission. *Id.* at 646. But the Austin court abandoned that construction of section 43(e) after the Legislature amended PURA in 1983, holding that the amended version permitted utilities to implement bonded rates during the pendency of an appeal before the Commission. *See Tex. Util. Elec. Co. v. Pub. Util. Comm'n*, 881 S.W.2d 387, 401–02 (Tex. App.—Austin 1994) *aff'd in part, rev'd in part per curiam, Pub. Util. Comm'n of Tex. v. Tex. Util. Elec. Co.*, 935 S.W.2d 109 (Tex. 1996). This Court affirmed that holding. *See Texas Util. Elec.*, 935 S.W.2d at 110 (affirming in all respects except one issue relating to tax expenses).

[27] Under the COSA clause, CenterPoint is required to reimburse municipalities for their "reasonable expenses" in conducting a review of its annual rate adjustment "in an aggregate amount not to exceed $100,000," which aggregate amount includes the reasonable expenses of all regulatory authorities conducting such a review. The Coalition complains that this cap is "arbitrary," but it provides no elaboration or legal authority in support of this assertion. To the extent the Coalition intended to argue that the Commission lacks authority to place a limitation on municipalities' reimbursable expenses, we note that the Austin Court of Appeals has held that, in a full rate case, the Commission has authority to review rate-case-expenses for which a municipality seeks reimbursement and to decline reimbursement for any expenses beyond what it determines to be reasonable. *Cities of Port Arthur, Port Neches, Nederland & Groves v. R.R. Comm'n of Tex.*, 886 S.W.2d 266, 269 (Tex. App.—Austin 1994, no writ). After-the-fact review of the reasonableness of expenses is different, of course, from a before-the-fact cap on expenses, and the Commission may have authority to engage in one but not the other. But the review of a utility's proposed rate increase is also different from a review of a utility's reporting of financial data to be considered in a previously approved rate formula. The Coalition provides no analysis or authority addressing these differences or how they relate to any provision of GURA—the sole source of the Commission's authority. To the extent the $100,000 cap may have been arbitrary and unreasonable as applied in this particular case, the issue raised before the Court is not whether the Commission abused its discretion in approving this particular COSA, but rather whether the Commission lacked authority to approve a COSA at all.

in which the municipalities were afforded all of the jurisdiction, powers, and duties that GURA grants to them.

We note that, under the COSA clause, municipalities retain the authority to deny an annual adjustment (just as it could deny a proposed rate increase) and to participate in any appeal of that decision to the Commission (just as it could in a rate case). *See id.* §§ 103.051–.056. Similarly, the COSA clause expressly provides that the municipalities and the Commission retain their authority to initiate a ratemaking proceeding to decrease CenterPoint's rate if they determine that the adjustment results in a rate that is not "just and reasonable" or a return on investment in excess of what is "reasonable."[28] *See id.* §§ 104.003, 105.051. Absent a denial or the initiation of a ratemaking proceeding, the adjustment will occur in accordance with a rate that is already the result of a full rate case. Although that rate allows the municipalities to review the adjustment, the review does not require a full rate case, and thus GURA does not require that the review afford municipalities jurisdiction, powers, and duties as if it did.

Ultimately, we reject the Coalition's jurisdictional argument because, as we concluded in the preceding section, GURA's requirements do not apply each time a "practice" that the Commission approved through a full rate case "affects" the utility's compensation or charge. The "compensation" and "charge" and the practice that affects them, as we have said, are all part of the one rate. The COSA clause does not "affect" municipalities' jurisdiction, powers, and duties related

_____

[28] CenterPoint concedes that the COSA does not insulate it from the municipalities' original ratemaking jurisdiction, as "[n]othing in the COSA tariff deprives cities of their right under GURA to initiate a full, general rate case any time they believe it does not result in rates that are just and reasonable." The Commission agrees that cities may initiate a full rate case at any time and all of the requirements of a full rate case will apply. The COSA itself states that "[n]othing herein shall abrogate the jurisdiction of the regulatory authority to initiate a proceeding at any time to review whether rates charged are just and reasonable."

to rate changes because it does not cause a rate change. Rather, it is a "practice" that "affects" the utility's "compensation" and "charge," and GURA expressly authorizes the Commission to establish such a rate.

## IV.
## Conclusion

On the sole issue before us, we conclude that GURA granted the Commission authority to enter the final order in this case, including the COSA clause, to establish the rate CenterPoint may charge its customers in the applicable areas of the Texas Coast Division. The Commission and CenterPoint did not challenge the district court's judgment "on the alternative ground relating to the Commission's findings regarding payments to affiliates," and thus the court of appeals reversed the district court's judgment concerning the Commission's authority but remanded the case to the district court. Having affirmed the court of appeals judgment, we remand the case to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey S. Boyd
Justice

**Opinion delivered: January 17, 2014**